LEROY M. LEFKOWITZ and EMPIRE SYSTEMS, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lefkowitz v. Commissioner
Docket No. 5985-80.
United States Tax Court
T.C. Memo 1983-356; 1983 Tax Ct. Memo LEXIS 434; 46 T.C.M. (CCH) 485; T.C.M. (RIA) 83356; June 16, 1983. Jay R. Ziegler, for the petitioners. Alan J. Pinner and Mary Schewatz, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following income tax deficiencies: Petitioner
Taxable Year Ended
Amount
LeRoy M. Lefkowitz
12-31-75
$21,809
12-31-76
19,764
Empire Systems, Inc.
5-31-74
46,800
5-31-75
106,408
5-31-76
106,800
After concessions, the only issue remaining in dispute is the determination of a reasonable salary allowance for LeRoy Lefkowitz from his wholly-owned corporation, Empire Systems, Inc. (ESI), for ESI's taxable years ended May 31, 1974, through *435 May 31, 1976. This in turn will decide ESI's allowable deductions for those years for contributions in respect of Lefkowitz to its pension and profit-sharing plans. Also, such determination may be employed in the maximum tax computation for Lefkowitz under section 1348, I.R.C. 1954, for 1975 and 1976. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. LeRoy Lefkowitz (hereinafter petitioner) resided in Tarzana, California, at the time his petition was filed. He timely filed Federal income tax returns for 1975 and 1976 with the Fresno, California, Service Center. At the time its petition was filed, ESI was a California corporation with its principal place of business in Van Nuys, California. At all relevant times ESI has reported its income on an accrual basis for a fiscal year ending May 31, and it timely filed Federal corporate income tax returns for its fiscal years ending in 1974, 1975, and 1976 with the Fresno, California, Service Center. Petitioner graduated from high school in 1959 and attended college for two and one-half years with a concentration in business and accounting. *436 He then worked briefly with Cleaning Bar Association (a dry cleaning operation) as a bookkeeper and assistant to the company's president. He thereafter spent approximately two and one-half years working for a jobber of corrugated cartons and related shipping materials, at which company he rose from warehouse manager, at the age of about 21, to general manager. During that period he was "dating" the owner's daughter, whom he married and from whom he was subsequently divorced. He then worked in a hotel in Las Vegas, Nevada, and thereafter owned and operated a men's retail clothing business in that city. In 1966 petitioner and a friend, Alan Levine (Levine) formed a partnership to engage in the retail and "commercial" sale of stationery and office supplies in the Los Angeles area. Levine had spent several years at a Los Angeles stationary company, and he was able to bring a small number of commercial accounts to the new venture. The partnership, which was known as Empire Stationers, was capitalized with $10,000 contributed by Levine. Within four months of commencing operations, petitioner and Levine decided to close their retail store and concentrate on the more promising *437 commercial business, which involved the purchase of large quantities of office supplies from manufacturers or distributors and the resale to large users. Levine functioned as the "outside" salesman, visiting businesses to obtain orders, while petitioner was "inside", handling purchasing, financing, preparation of shipments, etc. After some time they began to seek larger accounts, and this got them into competitive bidding for longer-term contracts as opposed to just repeated solicitation of individual orders. Through a contract of Levine's they were able to bid on and obtain a contract awarded by a company called Scientific Data Systems (SDS), which was later acquired by Xerox Corporation. Empire Stationers thereafter successfully bid on a contract for all of Xerox's office supply needs in 13 western states, and by 1970 this contract accounted for more than 70 percent of the partnership's business. In May 1970 Empire Stationers was incorporated as Empire Systems, Inc. (ESI). Petitioner and Levine each received 50 percent of ESI's shares, and petitioner became president of the corporation while Levine served as its vice president. However, they regarded themselves as equal "partners" *438 and no particular significance was attributed to the fact that Lefkowitz was designated "president". Prior to 1970, ESI discovered that some of its customers were purchasing office supplies from companies which were marketing these products over the telephone rather than in person. After an investigation by petitioner, he and Levine became interested in entering this business as well. While telephone marketing was to a certain extent simply another way of selling office supply products, in practice it was a business substantially different from ESI's. ESI sold thousands of different items to customers whose monthly purchases averaged from $200 to $500, and its market was concentrated in southern California. In contrast, the telephone sales business was focused on repeated sales of a very limited number of heavily used "consumables", such as pens and pencils, tape, staples, etc., and it required a staff of salesmen who solicited customers of all sizes in all parts of the country. Moreover, the success of telephone marketing depended upon the ability of a salesman to obtain an initial order from a customer with whom he was unacquainted solely on the basis of a high-pressure sales *439 pitch delivered over the telephone, which, if successful, was then followed up with repeated solicitations for additional orders. ESI's business, on the other hand, was largely dependent upon the development of a personal business relationship between the "outside" salesman and the purchasing agent of the customer, with the expectation that the customer would then turn to the company as supply needs arose. This personal relationship was also an important factor in the company's ability to bid successfully on the longer-term supply contracts, such as those obtained from SDS and then Xerox. Thus, petitioner and Levine could not simply fall back on their experience gained from operating ESI in attempting to market office supplies over the telephone. At about this time, petitioner and Levine were introduced to a man named Lawrence Brandon, who was experienced in the field of telephone sales of office supplies. They agreed to combine their financial resources with Brandon's expertise in order to launch a new venture, and in June 1970 a corporation called International Business Suppliers, Inc. (IBS) was formed for this purpose. IBS's shares were split equally among petitioner, Levine, *440 and Brandon's wife Ilene, [1] and these three were elected president, secretary, and vice president of the corporation, respectively. Brandon entered into an "Exclusive Services Agreement" with IBS, to serve as its general manager for five years (with a two-year renewal at IBS's option) at a salary of $400 per week net of certain payroll tax deductions. Petitioner and Levine entered into a similar agreement with IBS, under which they were to provide their services exclusively (aside from ESI) to IBS for two years, again with a two-year renewal at IBS's option. Petitioner and Levine were each to be paid the same salary as Brandon. Brandon was responsible for establishing virtually the entire structure of the IBS operation as well as providing the initial staff. Thus, he brought in telephone salesmen from a defunct company with which he had previously been connected; he brought in a sales manager and an office manager from former businesses, as well as an outside accountant who became IBS's controller; he brought books identifying the items to be sold and the prices to *441 be charged; he set up the paper flow of the operation and the physical design of the sales department, including the more or less sound-proof cubicles in which the salesmen worked; he introduced the practice of verifying orders, which was necessary because the telephone salesmen in particular, and to a certain extent the general business practices in this field, were of somewhat questionable ethical standards; and he suggested that the business "factor" its accounts receivable, which involved selling the receivables immediately, at a discount, rather than waiting a month or more for collection at full value. Neither Levine nor Lefkowitz had any expertise in such an operation, and would have been incapable of setting it up without Brandon. Levine was not involved in IBS at the start. Brandon ran the operation, but petitioner oversaw it in an executive capacity, and maintained contacts with the "factor". In addition, he made an initial significant contribution to IBS's success by deciding to use the credit-rating services of Dun & Bradstreet (D & B) in selecting "leads", i.e., potential customers, for the telephone salesmen to call. While it was not an uncommon practice in this *442 industry to purchase leads, the use of D & B's services to compile lists of business organizations in accordance with certain specifications enabled IBS to solicit only credit-worthy accounts, and thus minimize the need for credit checks and a collection department. The consequential reduction of IBS's overhead was an important element in the company's growth. Although Brandon's know-how was indispensable in structuring the IBS business and in operating it from the start, his aggressive and disruptive manner was creating problems, and in August 1970, some three months after he was hired, his employment with IBS was terminated. Ilene Brandon's shares were thereafter redeemed, leaving petitioner and Levine each with 50 percent of the IBS shares. Levine became the sales manager of IBS near the end of 1970, and he continued in this position until he ceased working for IBS and ESI about two years later. His stock was then redeemed pursuant to an agreement of October 12, 1973, and since that time petitioner has been the sole shareholder of ESI. [2]
*443 Levine was replaced as sales manager of IBS by Lawrence Nussbaum, who had been hired initially in June by Brandon to perform other services for IBS. After becoming sales manager, Nussbaum was also made vice president, secretary, and a director of ESI. Nussbaum's duties included supervising the salesmen and supplying them with leads, overseeing the handling and verification of orders, and checking on shipments. While his position involved substantial responsibility, initially he checked with petitioner on matters of importance. During the years in question, Nussbaum took on the additional responsibilities of running IBS's warehouse in Chicago and doing some of the purchasing as well as searching for new products. Since the greater number of customers and suppliers of IBS were in the eastern part of the country, IBS established a warehouse in the Chicago area. Petitioner was responsible for this step, which considerably improved the functioning of the organization. As Nussbaum's role in the company evolved, he went to petitioner less and less to obtain approval for his decisions. Petitioner was the chief executive officer of the company during the period 1974-1976, and he *444 oversaw all aspects of its operations. This was accomplished primarily through his supervision of Nussbaum and several others in respect of the IBS business, as well as the two employees who had responsibility for coordinating ESI's basic activities. Petitioner's attention was also given to expanding the company's physical facilities, both at its home office in Los Angeles and the warehouse in Chicago; attracting salespeople to the company; and increasing the applications of its data processing system, which had been installed initially at his initiative by IBM. In addition, he handled some special purchases, and kept watch over the company's cash flow through his supervision of the controller. During the fiscal years ending in 1971 through 1976, the gross sales and taxable income of ESI and IBS were as follows: Year Ended
Gross Sales
Taxable Income
May 31
ESI
IBS
Total
ESI
IBS
Total
1971
$260,052
$1,947,184
$2,207,236
$22,194 $4,945
$27,139
1972
299,279
2,144,861
2,444,140
4,012 21,343
25,355
1973
410,790
2,011,007
2,421,797
3,087 139,513
142,600
1974
379,691
2,579,382
2,959,073
26,388 162,608
188,996
1975
377,426
2,854,703
3,232,129
(817)
251,458
250,641
1976
385,956
3,151,099
3,537,055
60,012 272,479
332,491
*445 Although petitioner and Leveine had entered into an "Exclusive Services Agreement" with IBS, which specified that each would be paid $400 per week net of payroll taxes for up to four years, it appears that neither was paid any salary by IBS. Instead, because the company maintained pension and profit-sharing plans in respect of only ESI, all employees of the company who were eligible to be covered under the plans were nominally employed by, and paid by, ESI, and the services of those who worked for IBS were provided to IBS by ESI in exchange for a "management fee". Thus, petitioner, Levine, and Nussbaum received all of their compensation for personal services from ESI. ESI's board of directors, the composition of which is not fully identified by the record, neither set the salaries of its officers in advance nor took any formal action to approve salary decisions. In fact, it appears that the company had no established formula or practice for determining the executives' salaries. From June 1, 1972, until Levine formally left the company in October of 1973, petitioner and Levine simply withdrew money from time to time at their discretion, and such withdrawals were recorded in *446 an account entitled "Officers' Loans". Despite use of the term "Loans", it appears that little, if any, interest was paid in respect of these withdrawals, and no notes were signed to evidence repayment obligations. In some manner not made clear by the record, it appears that petitioner and Levine determined at the end of each fiscal year what their salaries would be, and then appropriate adjustments were made to the loan account. As of May 31, 1973, petitioner's loan balance was zero, while Levine owed the company some $93,832.05. This balance was carried until October of that year, at which time the debt was extinguished pursuant to the redemption of Levine's stock. After Levine's departure, petitioner did not consult with anyone inside the company in respect of his salary determination. Instead, he met with his outside accountant at one or more times during, or at the end of, the fiscal year and then set his salary at whatever amount the accountant recommended. ESI's general ledger, together with an explanation thereof provided at trial by its then controller, discloses the following record of accruals and payments in respect of petitioner's salary for ESI's fiscal years *447 ending in 1974-1976: Date
Explanation of Entry
Amount
Dec. 31, 1973
Paid to petitioner
$ 80,000
May 31, 1974
Accrued (Paid July 31, 1974)
70,000
Total salary F/Y/E May 31, 1974
$150,000
May 31, 1975
Paid to petitioner
$100,000
May 31, 1975
Accrued (Paid Aug. 31, 1975)
150,000
Total salary F/Y/E May 31, 1975
$250,000
May 31, 1976
Accrued (Paid later in 1976)
$250,000
Total salary F/Y/E May 31, 1976
$250,000
The total compensation received by petitioner, Levine, and Nussbaum during fiscal years 1971-1976 was as follows: Petitioner
Levine
Nussbaum
Contribu-
Contribu-
Contribu-
Year ended
tions to
tions to
tions to
May 31
Salary
Plans
Salary
Plans
Salary
Plans
1971
$46,025
$11,506
$46,025
$11,506
$ ?
$ ?
1972
26,000
6,500
26,000
6,500
1973
36,000
9,000
36,000
9,000
1974
150,000
37,500
25,175
6,294
1975
250,000
62,500
26,625
6,656
1976
250,000
62,500
36,634
9,159
The record is silent as to the manner in which Nussbaum's compensation was determined or the intervals at which it was paid. The average salary *448 paid in 1976 in Los Angeles was 8.2 percent higher than the national average. From its inception through May 31, 1976, ESI paid no dividends. At trial, the petitioners presented the testimony of an expert witness, Brian M. Cameron, a compensation consultant in the western United States with a "Big Eight" accounting firm. Mr. Cameron concluded that ESI's salary allowances for petitioner for the years in issue were reasonable. The Government presented the testimony of its own expert, E. James Brennan, also an experienced compensation consultant. Mr. Brennan detemined that petitioner's salary level in fiscal 1974-fiscal 1976 was not reasonable, and based upon his study of the matter he further determined the following "competitive" and "maximum 'reasonable'" salary allowances for petitioner: Fiscal Year
"Competitive"
"Maximum
Ended May 31
(Average) Salary
'Reasonable'" Salary
1974
$60,029
$75,036
1975
71,410
89,262
1976
75,543
94,428
In each instance, the "maximum 'reasonable'" salary is 25 percent greater than the "competitive" salary. The parties have stipulated that the correct Standard Industrial Classification number for ESI for the *449 years in question was 5943, which is for stationery stores and which falls in the larger "Group 59 - Miscellaneous Retail". ESI's Federal income tax returns for these years identify its business activity as retail sales of office supplies. It is also stipulated that from 1973 to 1976 the Consumer Price Index rose from 133.1 to 170.5, an increase of some 28.1 percent. In the notice of deficiency issued to ESI, the Commissioner limited ESI's salary expense in respect of petitioner to $72,000 for each year. [3] This in turn resulted in the disallowance of deductions for ESI's contributions in respect of petitioner to its pension and profit-sharing plans to the extent those contributions exceeded 25 percent of $72,000, or $18,000. The parties have stipulated that in respect of the contributions ESI is entitled to a deduction for each year equal to 25 percent of the amount determined to be a reasonable salary allowance for petitioner for such year. In the notice of *450 deficiency issued to petitioner, the Commissioner adjusted the maximum tax computation for 1975 and 1976 to reflect his determination that the salary paid to petitioner in each of those years exceeded a reasonable allowance for personal services to the extent of $178,000 ($250,000 - $72,000). This matter, like ESI's deductions for contributions to its pension and profit-sharing plans, will be resolved by our decision as to a reasonable salary allowance for petitioner for the years in question. OPINION Section 162(a)(1), I.R.C. 1954, allows as a deduction from the income of a trade or business "a reasonable allowance for salaries or other compensation for personal services actually rendered". Under the applicable Treasury regulation, the "test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services". Section 1.162-7(a), Income Tax Regs.
We are not persuaded by the record presented that petitioner's salary in fiscal 1974, fiscal 1975, or fiscal 1976 was purely compensation for services rendered. While we do not doubt that his business acumen, hard work, nd dedication to his company were all important *451 factors in achieving its success, we are not satisfied that the services which he rendered to the company during these years were so extraordinary, or so much different from the services rendered in prior years, as to explain allowances for salary which were generous by any standard, and, more important, were totally inconsistent with the salary history of the company. Indeed, we think that the evidence presented warrants the conclusion that the rapid increase in his salary during these years was attributable at least in part to his becoming sole stockholder of the company, leaving the inference that a portion of his salary in each year represented a distribution of corporate earnings rather than compensation for services. During the years in question, petitioner's business was growing and was proving to be highly profitable. While it is true that exceptional results may to a certain extent justify unusually high salaries, see Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1162 (1980), such success is also consistent with an expectation that the business will pay dividends. Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 606 (9th Cir. 1968). *452 Here, no dividends were paid from the inception of the business through fiscal 1976, and petitioner has offered no convincing explanation for this circumstance. Nor is it readily apparent from the nature of the business that there was a need to accumulate funds for specific corporate purposes. In the circumstances of this case, we find the failure to distribute any part of the progressively larger annual earnings as dividends to be particularly damaging to the taxpayers' cause. It is also significant that the dramatic escalation of petitioner's compensation to levels totally inconsistent with the company's salary history coincided with his becoming the sole shareholder in the Fall of 1973. In June 1970, when petitioner, Levine, and Brandon negotiated the start-up of IBS and each received one-third of its shares (Brandon through his wife), the salary of each was set at a modest $20,800 (net of certain payroll tax deductions). Even after Brandon left, the salaries of petitioner and Levine, who then each owned 50 percent of the shares, stayed within a comparable range. Thus, from fiscal 1971 to fiscal 1973, their salaries actually decreased from $46,025 each to $36,000 each, even *453 though the combined income of ESI and IBS, before allowance for compensation (salaries and contributions to plans) of petitioner and Levine, rose from $142,201 to $232,600. After Levine left in the Fall of 1973, however, petitioner was the only stockholder in the company and the allowance for his salary became considerably more generous. In fiscal 1974, when income before executive compensation [4] rose 75 percent, his salary rose 317 per cent to $150,000. In fiscal 1975, his salary of $250,000 was 594 percent higher than two years earlier, even though income before executive compensation increased only 156 percent during the same interval. In fiscal 1976, petitioner's salary leveled off at $250,000, while income before executive compensation rose some 16 percent. We note further that as sales manager of IBS Levine earned the same salary as petitioner, yet his replacement, Nussbaum, earned far less than petitioner. In fact, Nussbaum, who owned no shares in the company, not only took over Levine's duties, but also came to be *454 responsible to a substantial extent for the day-to-day operation of IBS. Still, his salary rose from only $25,175 in fiscal 1974 to $36,634 in fiscal 1976, which latter amount was but $634 more than Levine earned in fiscal 1973. During this same period, petitioner enjoyed a salary increase of $214,000, even though his duties were, if anything, contracting because of Nussbaum's growing role in the business. This is further evidence that petitioner's "comparatively large" salary payments "were partially based on factors other than mere compensation for services rendered". Giles Industries, Inc. v. United States,496 F. 2d 556, 563 (Ct. Cl. 1974); compare Giles Industries, Inc. v. United States,650 F. 2d 274, 279 (Ct. Cl. 1981). The amount of petitioner's salary was not the only thing that changed when he became the sole stockholder of the company; the manner and timing of the salary determination were also substantially different. No longer was his salary simply a function of his intermittent cash withdrawals. Instead, he left the determination of his salary to his accountant, and from the table appearing on page 13, supra, it appears that *455 this decision was generally made at or near the end of the fiscal year, when annual profits could be ascertained. This suggests that to a certain extent the salaries were intended as disguised distributions of corporate earnings. Cf. Ecco High Frequency Corp. v. Commissioner,167 F. 2d 583, 585 (id Cir. 1948e, cert. denied 335 U.S. 825 (1948). [5]
Petitioner attempts to counter this evidence with the argument that his equity interest should be viewed as an added incentive to devote his energies to the business, thus justifying his generous salary allowance, rather than an indication that he was attempting to drain off corporate earnings in the form of compensation for services. While it may be a "fair general assumption that the owners of a business * * * will devote those extra ounces of energy, thought, and devotion that will spell not merely the difference between success and failure but the difference between success and extraordinary success" (footnote omitted), Edwin's Inc. v. United States,501 F. 2d 675, 678 (7th Cir. 1974), *456 the equity interest alone may be sufficient to produce such efforts by the shareholder-employee, thus rendering superfluous any salary above the norm. See Charles Schneider & Co., Inc. v. Commissioner,500 F. 2d 148, 153 (8th Cir. 1974), cert. denied 420 U.S. 908 (1975). In this case, we are not convinced that petitioner's efforts were even extraordinary, no less that they were so integral to the success of the business that unusual compensation might be called for. We have found that the IBS enterprise, which accounted for most of the company's sales and profits, was launched largely on the basis of Brandon's expertise, [6] and the record does not show that petitioner's involvement during the years at issue was in any significant respect greater that that which is expected of an ordinary president or chief executive officer. It is true that petitioner's idea of utilizing the credit rating services of D & B was an important factor in IBS's success, but this practice was begun in 1970 during the early start-up days of IBS. We are also fully aware that petitioner was responsible for setting up the warehouse in the Chicago area as well as for initiating *457 the use of computers. However, these contributions to the success of the enterprise are of the kind that may reasonably be expected of a chief executive, whose salary should obviously be greater than compensation paid to employees of lower rank. But all of these contributions cannot be said to justify petitioner's disproportionately large salary increases in 1974 and 1975. Moreover, it was Nussbaum, and not petitioner, whose duties and responsibilities were expending during the period 1974-1976.
Petitioner also contends that the higher salaries represented, in part, compensation for past services rendered in years in which he was under-compensated. We think this argument is little more than an expostfacto attempt to justify excessive compensation here. There is no evidence that any amount of his salary in the years at issue was contemporaneously allocated as compensation for past services, either by a resolution of the board of directors or in some other manner, and petitioner has not made any attempt to show what portion of the salary *458 was paid for this purpose. In such circumstances, this position is at best shaky. See Pacific Grains, Inc. v. Commissioner,399 F. 2d at 606. Nevertheless, the amounts hereinafter determined as reasonable compensation (deferred as well as non-deferred) reflect to a certain extent a recognition that petitioner's efforts in the critical early years of his business were instrumental in keeping that business on the path to success while competitors in the industry were failing. We have examined carefully the reports and testimony of both expert witnesses. Although we had some reservations about both reports prior to trial, upon further consideration in the light of the testimony of the experts we have found the reports to be more useful. Nevertheless, while it would serve no useful purpose to explain item by item the extent to which we agree or disagree with each analysis, we pause here to note certain problems we have with the report of Mr. Cameron, the taxpayers' expert. First, for purposes of comparing salaries Mr. Cameron selected "Wholesale Trade: Miscellaneous Wholesale Trade: Paper and its Products" as the industry segment most similar to ESI, yet the parties *459 have stipulated, consistent with ESI's Federal income tax returns, that the company was engaged in retail sales. Second, even though Mr. Cameron was analyzing the reasonableness of the salary paid to a single executive, petitioner, the sole data base on which he relied reports only total officers' compensation for the allegedly comparable businesses, with no breakdown provided as to the number of officers included or the portion of the total compensation which was paid to the top executive. Finally, Mr. Cameron's report projected total officers' compensation for the company in 1975 of $177,220, but he still was able to conclude that a salary of $250,000 for petitioner alone was "reasonable". The dubiety of this conclusion, particularly when combined with Mr. Cameron's somewhat surprising judgment expressed at trial that a "reasonable" salary range for petitioner was between $50,000 and $300,000, leaves us unwilling to place great emphasis on his report and testimony as a whole. Mr. Brennan's report, on the other hand, seems to rest on a somewhat firmer foundation. He analyzed three separate surveys of base salaries paid to chief executive officers of retail corporations *460 comparable in size to petitioner's business. From these surveys, which are the most common sources used by boards of directors in setting executive salaries, he computed the "competitive", or average, salary paid by comparable companies. In order to account for variations from the average, attributable at least in part to exceptional results produced by individual executives, Mr. Brennan then increased the "competitive" salary for each year by 25 percent and termed this amount the "maximum 'reasonable'" salary. Mr. Brennan chose the 25 percent figure because he thought it was the maximum variation above the average in the surveys he used, although it was shown at trial that in one of the surveys some companies many times larger than ESI paid salaries in excess of 25 percent above the average. The "maximum 'reasonable'" salaries for petitioner, as shown in Mr. Brennan's report, were $75,036 for fiscal 1974, $89,262 for fiscal 1975, and $94,428 for fiscal 1976. On the record before us, including the reports and testimony of both experts, we are convinced that ESI's salary allowances for petitioner for the years in issue were neither "reasonable" nor "purely for services". On the *461 other hand, we are not persuaded that the allowance should be limited to the lesser of the amount determined by the Commissioner or the average ("competitive") salary shown in Mr. Brennan's report, which is the position taken by the Government on brief. Certainly, ESI's profits were not average, and it is clear that petitioner contributed a great deal to his company's success. Moreover, section 162(a) does not require the disallowance of a deduction simply because a particular salary exceeds the norm, Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1162 (1980); instead, the deduction is merely limited to a reasonable salary in the circumstances. Using our best judgment, we conclude that a reasonable salary allowance as compensation for the services provided by petitioner to the company in each year in question was: Fiscal Year Ended
May 31
Salary
1974
$80,000
1975
90,000
1976
100,000
Here, the company's deduction for compensation to petitioner is not limited to these amounts. It is clear that compensation includes deferred as well as non-deferred amounts, see Edwin's Inc. v. United States,supra,501 F. 2d at 679; *462 LaMastro v. Commissioner,72 T.C. 377, 382-383 (1979), [7] and the parties have stipulated that the company is entitled to a deduction for deferred compensation in each year equal to 25 percent of the amount determined herein as a reasonable salary (non-deferred) allowance for tetitioner. Thus, the company is allowed deductions as reasonable compensation for services rendered by petitioner of $100,000 in fiscal 1974, $112,500 in fiscal 1975, and $215,000 in fiscal 1976. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. These shares were not issued in Brandon's name because he had previously been convicted of mail fraud.↩
2. In May 1971, ESI had purchased all of IBS's outstanding shares from Levine and petitioner. Thus, at the time of this redemption Levine and petitioner held only ESI stock. Hereinafter, all references to "the company" or "the business" will include both ESI and IBS, unless otherwise noted.↩
3. On brief, the Government amended its position to raise this amount to $75,543 for fiscal 1976, in order to reflect the higher amount shown for that year as "competitive" salary in the report of its expert.↩
4. From fiscal 1974 to fiscal 1976, executive compensation consisted of salaries and contributions to plans in respect of petitioner and Nussbaum.↩
5. See also Rich Plan of Northern New England, Inc. v. Commissioner,37 TCM 1853↩-8, 1854, 47 P-H Memo T.C. par. 78,514 (1978).
6. We found Brandon's testimony in this respect to be credible, despite his flamboyant and irrepressible demeanor at trial.↩
7. See also Rich Plan of Northern New England, Inc. v. Commissioner,37 TCM 1853↩-8, 1853-13, 47 P-H Memo T.C. par. 78,514 (1978).